**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GORGI NAUMOVSKI,<br><br>　　　　　　　Defendant. | No. 20 Cr. 384 (WFK) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GORGI NAUMOVSKI'S
MOTION TO DISMISS THE INDICTMENT FOR IMPROPER VENUE OR
TO TRANSFER THE CASE TO THE MIDDLE DISTRICT OF NORTH CAROLINA**

Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com


July 17, 2023

Now comes the defendant Gorgi Naumovski, by and through undersigned counsel, and hereby respectfully submits this memorandum of law in support of his motion to dismiss the indictment for improper venue under Fed. R. Crim. P. 12(b)(3)(A)(i), or to transfer the case to the Middle District of North Carolina pursuant to Fed. R. Crim. P. 21(b).

## I. Background

Between April 2016 and December 2018, Mr. Naumovski and an individual named Andrew Chmiel[1] were among the owners of Life Source Medical, Inc. ("Life Source"), a durable medical equipment ("DME") provider located in Greensboro, NC.[2] Indictment at ¶¶ 4, 6. Life Source was purchased by Mr. Naumovski and Mr. Chmiel from a North Carolina resident in 2016. During the relevant period, Mr. Naumovski resided in Illinois with his wife. Mr. Chmiel resided in South Carolina. Though Mr. Naumovski was one of Life Source's owners, the company's day-to-day operations were undertaken by employees in its Greensboro, NC office. As a DME supplier, Life Source provided patients with medical equipment prescribed by physicians or other licensed medical professionals. Life Source in some instances provided this equipment to patients from its retail location in Greensboro, NC, and in other cases shipped the equipment directly to patients from Comfortland Medical Inc. ("Comfortland"), a DME supplier in Mebane, NC, which (like Life Source itself) was in the Middle District of North Carolina.[3]

During the period of the indictment, Life Source had no employees or offices in the Eastern District of New York. Similarly, Mr. Naumovski did not visit the Eastern District of

---

[1] The indictment identifies Andrew Chmiel as Co-Conspirator 1. Mr. Chmiel and various DME-related businesses he operated have been criminally charged in the United States District Court for the District of South Carolina. *See United States v. Chmiel* et al., 3:19-cr-00299 (D.S.C.).

[2] Greensboro, NC is in Guilford County, which is part of the Middle District of North Carolina. *See* https://www.ncmd.uscourts.gov/ncmd-counties (last visited July 15, 2023).

[3] *See id.* (noting that Alamance County, which is the county in which Mebane, NC is found, is part of the Middle District of North Carolina).

1

New York during this time. Furthermore, any shipments or sales to patients located in the Eastern District of New York were a small percentage of Life Source's business.[4]

Notwithstanding the government's inexplicable decision to charge Mr. Naumovski in this courthouse, the defense is not aware of any indication in the discovery that Mr. Naumovski knew or intended that DME shipments would be directed at patients in the Eastern District of New York. Indeed, prescriptions were processed by Life Source employees in Greensboro, NC; DME equipment was provided to patients at Life Source's retail location or sent to patients by Comfortland in Mebane, NC; and insurance was billed either by Life Source employees in Greensboro or outsourced to a company associated with Mr. Chmiel.

The indictment alleges that Mr. Naumovski conspired with Mr. Chmiel and others to commit health care fraud. Specifically, the indictment alleges that Mr. Naumovski "paid bribes and kickbacks, directly and indirectly, to co-conspirators by purchasing completed prescriptions and other necessary documentation (collectively, "Doctors' Orders") that were necessary to submit claims to Medicare for DME." Indictment at ¶ 7. The indictment further alleges that Mr. Naumovski "and others then used these Doctors' Orders to submit and cause the submission of false and fraudulent claims to Medicare for the supply of orthotic braces and other DME to beneficiaries, including beneficiaries who resided in the Eastern District of New York." *Id.* The indictment does not allege, however, that any patients were defrauded, let alone that any fraud of any kind occurred in this district. To the contrary, the crux of the criminal conduct alleged in the indictment is the purchase of Doctor's Orders, and the use of those Doctor's Orders to submit claims to Medicare for payment—none of which appear to have taken place in the Eastern District of New York.

---

[4] Based on documents produced by the government in discovery, the defense believes less than 2.3% of all Life Source patients (including Medicare and private insurance customers) resided in the Eastern District of New York.

2

**II.    This Honorable Court should dismiss the indictment for lack of venue.**

Venue lies in the location of the act or acts constituting the offense alleged. U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; Fed. R. Crim. P. 18 ("prosecution shall be had in a district in which the offense was committed"); *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999); *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005). Venue provisions "should not be so freely construed" because "questions of venue are more than matters of mere procedure" and instead "'raise deep issues of public policy.'" *Travis v. United States*, 364 U.S. 631, 634 (1961) (*citing United States v. Johnson*, 323 U.S. 273, 275 (1944)). The "right" to be tried in the place of a crime's commission was "highly prized by the founding generation" and "undoubtedly inspired the Venue and Vicinage Clauses." *Smith v. United States*, 143 S. Ct. 1594, 1606 (2023). Indeed, there is "no question that the founding generation enthusiastically embraced the vicinage right and wielded it as a political argument of the Revolution." *Id.* at 1604 (footnote and internal quotation marks omitted); *accord id.* at 1606 (noting that common law juries "lacked authority to convict outside of their vicinage"); *id.* at 1604 (finding "no rule better established" than this one) (citation and internal quotation marks omitted).

While "there is no single defined policy or mechanical test to determine constitutional venue … . the test is best described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding…" *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985) (discussing fairness of venue in the "sense of having been freely chosen by [the defendant] as the place at which the [overt] acts were committed"); *see also United States v. Anderson*, 328 U.S. 699, 703 (1946) (Venue is

3

generally "determined from the nature of the crime alleged and the location of the act or acts constituting it.").

Accordingly, venue is only proper "where (1) the defendant *intentionally or knowingly causes an act in furtherance of the charged offense* to occur in the district of venue or (2) *it is foreseeable that such an act would occur* in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (emphasis added) (execution of trades on the NYSE and AMEX was sufficient to establish venue when defendant received actual notice that the trades were executed on those exchanges). "[P]urely ministerial acts" are insufficient to confer venue. *United States v. Bezmalinovic*, 962 F. Supp. 435, 438 (S.D.N.Y. 1997); *see also United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1190 (2d Cir. 1989) ("prior and preparatory" calls and mailings into the Eastern District of New York insufficient to confer venue); *United States v. Geibel,* 369 F.3d 682, 697 (2d Cir. 2004) (finding venue improper where actions in the Southern District of New York were "anterior and remote" to the criminal conduct); *United States v. Bozza,* 365 F.2d 206, 220–21 (2d Cir.1966) (finding venue improper in a district in which a telephone call was made to arrange for the receipt of stolen goods, but the receipt of property itself occurred in another district). Even in the context of conspiracy cases, "the overt act's occurrence" in the district in which the matter was charged must be "reasonably foreseeable to a conspirator." *United States v. Rommy*, 506 F.3d 108, 123 (2d Cir. 2007).

Here, the government's alleged health care fraud conspiracy occurred outside of the Eastern District of New York. Mr. Naumovski, Mr. Chmiel, and any other purported (but not yet identified) alleged co-conspirator(s) lived outside of this district. Life Source was headquartered outside of this district. All of Life Source's employees and offices were outside of this district. Life Source's DME supplier was located outside of this district. The conspiratorial agreement, if

4

there ever was one, occurred outside of this district. The defense is unaware of any purported purchase of a Doctor's Order or the submission of a claim to Medicare that occurred within this district. The sole link to the Eastern District of New York is that a small percentage of individuals who received braces from Life Source (less than 2.3% of all Life Source customers during the period at issue) happened to reside in the Eastern District of New York. Moreover, the number of Medicare clients in the Eastern District of New York who received DME because of the purported purchase of Doctor's Orders, which is the issue at the core of this case, is likely even smaller.

Just as importantly, those customers of Life Source who received braces in the Eastern District of New York *were not defrauded*. They received the DME that they ordered and received refunds for any DME they returned. Rather, the essential conduct relevant to the charged conspiracy – the alleged purchase of Doctor's Orders and submission of claims to Medicare – appears to have taken place exclusively outside of this district. In no uncertain terms, Mr. Naumovski thus lacked the constitutionally required "substantial contacts" necessary to prosecute him in this district. To hold otherwise would mean that Mr. Naumovski could be forced to answer these charges in any of the 94 judicial districts where a DME product was shipped or passed through, only limited by the government's unilateral decision to indict in a particular location.

Moreover, there is no evidence that the sole alleged acts occurring in this district – sending DME to Eastern District of New York customers whose Doctor's Orders had been purchased – were reasonably foreseeable to Mr. Naumovski. Mr. Naumovski was a part-owner of Life Source, but the indictment does not allege and the discovery does not reflect that he reviewed claims, reviewed the locations of customers, or reviewed to where shipments from Life

Source (or its vendor, Comfortland) were being sent. There is thus simply no evidence that Mr. Naumovski chose this district "as the place at which the [overt] acts were committed." *Reed*, 773 F.2d at 481. For these reasons, the indictment should be dismissed for lack of venue.

### III. Alternatively, this Honorable Court should transfer this case to the Middle District of North Carolina.

If, notwithstanding the above analysis, this Honorable Court determines that the indictment should not be dismissed, the Court should transfer this case to the Middle District of North Carolina pursuant to Fed R. Crim. P. 21(b). There can be no serious dispute that the Middle District of North Carolina is a constitutionally appropriate jurisdiction for trial and that no meaningful prejudice would result to the government based on a decision to transfer the case.

Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court. *See, e.g., United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990*)*; *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir. 1979). In deciding such a motion, the court should consider such factors as the (1) location of the defendant; (2) location of the possible witnesses; (3) location of the events likely to be at issue; (4) location of relevant documents and records; (5) potential for disruption of the defendants' businesses if transfer is denied; (6) expenses to be incurred by the parties if transfer is denied; (7) location of defense counsel; (8) relative accessibility of the place of trial; (9) docket conditions of each potential district; and (10) any other special circumstance that might bear on the desirability of transfer. *Id.*; *see also Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243–44 (1964). None of these considerations is dispositive, and "[i]t remains for the court to try to strike a balance and determine which factors are of greatest importance." *Stephenson*, 895 F.2d at 875.

Here, nearly every relevant factor weighs in favor of transferring the case to the Middle District of North Carolina. While Mr. Naumovski is a resident of southern Illinois, a location far

from both districts, there is no doubt that a transfer would be more convenient for potential witnesses. The Middle District of North Carolina is where Life Source was located. All employees who carried out the day-to-day operations of Life Source, its prior owner, and the DME supplier that shipped its products are in the Middle District of North Carolina. Indeed, it appears that the significant majority of the evidence and testimony related to Life Source's business practices would originate from the Middle District of North Carolina or from acts by Mr. Chmiel occurring in nearby South Carolina. *See United States v. Alter*, 81 F.R.D. 524, 526 (S.D.N.Y. 1979) (finding that the location of events at issue favored transfer to an alternate venue where "[i]t is beyond dispute that most, if not all, of the acts and conduct in furtherance of the alleged scheme to defraud occurred in [the alternate venue] and that it was the 'nerve center' of the alleged illicit operations in carrying out the scheme...."); *United States v. Haley*, 504 F.Supp. 1124, 1128 (E.D. Pa.1981) (where "many of the overt acts described in the indictment purportedly occurred in [the transfer venue] or surrounding states," this was showing of a "nerve center" which weighed in favor of transfer).

      The prejudice to the government from the requested transfer would be minimal. All government produced discovery is electronic and can be transferred to the Middle District of North Carolina seamlessly. To the extent there are physical servers that the government needs to access, those servers are in Atlanta, GA. *See* February 17, 2021, Discovery Letter, Dkt. 19 at 2. *See United States v. Posner*, 549 F. Supp. 475, 478 (S.D.N.Y.1982) ("[t]he location of documents and records is not a major concern in these days of easy and rapid transportation...."). To the extent that counsel for the government would need to travel to the Middle District of North Carolina, there are multiple, direct flights to Greensboro, NC from Newark and LaGuardia each day. *See, e.g., United States v. United States Steel Corp.,* 233 F.Supp. 154, 158

(S.D.N.Y.1964) ("The efficiency of modern air transportation renders rather sterile any argument" that one forum is more accessible than the other.).

A transfer to the Middle District of North Carolina would not negatively disrupt Mr. Naumovski's business any more than a trial in the Eastern District of New York. Similarly, Mr. Naumovski's trial counsel is in Boston, MA and a transfer would have no discernible effect on counsel's ability to represent Mr. Naumovski. The requested transfer would, however, reduce the parties' expenses by avoiding the need to bring witnesses from North and South Carolina to the Eastern District of New York. Moreover, the docket conditions of both districts support a transfer. According to the most recent Judicial Caseload Profile, the Eastern District of New York is the 14th busiest district in the country with 849 pending cases per Judgeship; the Middle District of North Carolina is the 66th busiest with 366 pending cases per Judgeship.

Finally, the Supreme Court recently ruled that the remedy for a venue violation is vacatur of judgment and retrial in an appropriate jurisdiction. *Smith v. United States*, 143 S. Ct. 1594, 1609 (2023). In the event the government fails to prove at trial that venue is proper in the Eastern District of New York, the case would have to be retried in a proper jurisdiction – like the Middle District of North Carolina. A potential second trial in a different district would be far more burdensome than a transfer to the Middle District of North Carolina now. Accordingly, if this Honorable Court determines that a dismissal is not warranted, the case should nonetheless be transferred to the Middle District of North Carolina for trial pursuant to Rule 21(b).

        Respectfully Submitted,
        Gorgi Naumovski,
        By His Attorney,

        **/s/ Maksim Nemtsev**
        Maksim Nemtsev, Esq.
        Mass. Bar No. 690826
        20 Park Plaza, Suite 1000
        Boston, MA 02116
        (617) 227-3700
        menemtsev@gmail.com

Dated: July 17, 2023

## CERTIFICATE OF SERVICE

I, Maksim Nemtsev, hereby certify that on this date, July 17, 2023, a copy of the foregoing document has been served, via ECF, on all registered participants.

        **/s/ Maksim Nemtsev**
        Maksim Nemtsev, Esq.